

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00032-CV

IN THE INTEREST OF M.P., A CHILD

-----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-96705J-12

-----------

## MEMORANDUM OPINION[1]

-----------

## I. Introduction

The trial court terminated the parental rights of Appellants Mother and Father to their child M.P.  This appeal followed, with Mother raising four issues, and Father raising five.  We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural Background

In June 2012, the Department of Family and Protective Services (DFPS) filed its original petition for protection of the child, for conservatorship, and for termination and removed one-and-a-half year old M.P. from her parents. The affidavit attached to the petition included allegations that M.P. was a special needs child who had been born with club feet and that on June 9, 2012, DFPS had received a referral regarding Mother's arrest for assaulting Father with a deadly weapon and her subsequent removal to John Peter Smith hospital (JPS) on a mental health hold and, later the same day, Father's shaking of M.P., who was taken to Cook Children's Medical Center.

DFPS issued service plans to Mother and Father that required them to participate in domestic violence education classes, an anger management program, parenting classes, individual and family counseling, and an alcohol and drug assessment; submit to random drug testing; address their mental health issues; obtain and maintain steady legal employment and safe, stable, and appropriate housing with working utilities; and have weekly supervised visits with M.P. Father's service plan also required him to "actively engage in an educational session with Shaken Baby Alliance" and to contact the coordinator for that activity no later than July 1, 2012.

In January 2013, DFPS moved to make the services court-ordered based on Mother and Father's minimal participation. The trial court granted DFPS's motion and issued an agreed order requiring Father to complete individual

2

counseling and anger management group counseling, complete a psychological evaluation, and provide verification of housing through a rental agreement or lease and verification of income in the form of an award letter or check stub. The trial court issued an agreed order requiring Mother to complete the same tasks as Father and requiring her to complete domestic violence education.

In April 2013, DFPS filed motions for additional court-ordered services.[2] The trial court granted the motions, ordering Father to continue medication monitoring at JPS, and to participate in individual therapy, anger management classes, and NA and ordering Mother to participate in anger management classes, a domestic violence education program, Alcoholics Anonymous, and a psychiatric consultation to treat her mood disorder and to provide names of appropriate people in her support system. It also ordered both parents to provide verification of housing and income; to continue to have supervised visits with M.P.; and to participate in couple's counseling, an outpatient drug treatment group, random drug testing, intensive parent training, filial therapy, and an assessment with the Department of Assistive and Rehabilitative Services for help in meeting their vocational goals and getting a job coach.

---

[2]DFPS's April 3, 2013 progress report indicates that Mother and Father had completed their parenting classes and had participated in drug treatment and psychological evaluations. From the psychological evaluations came recommendations for filial therapy, random drug testing, couple's counseling, and participation in Narcotics Anonymous (NA).

Mother and Father testified at the trial, which began on November 13, 2013. The Tarrant County Family Court Services (TCFCS) visitation supervisor and TCFCS assistant director; the former Child Protective Services (CPS) investigator and CPS caseworker involved in the case; and the licensed professional counselor who counseled both Mother and Father and taught their anger management course also testified. The trial court admitted Mother's and Father's psychological evaluations, Mother's and Father's counseling notes, an Azle Police incident report from June 2012, the report of the Court-Appointed Special Advocate (CASA), copies of Mother's 2005 judgment of conviction for burglary of a habitation and her 2002 judgment adjudicating guilt for possession of methamphetamine, and the medical records of Mother, Father, and M.P. The trial court overruled Mother's objections to the admission of the medical records and denied her motion for continuance with regard to them.

On March 4, 2014, the trial court terminated both parents' rights to M.P., finding that they had knowingly placed or knowingly allowed M.P. to remain in conditions or surroundings that endangered her physical or emotional well-being; that they had engaged in conduct or knowingly placed M.P. with persons who engaged in conduct that endangered her physical or emotional well-being; that they had failed to comply with the provisions of a court order that specifically established the actions necessary for them to obtain M.P.'s return, and that termination of their parental rights to M.P. would be in M.P.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O), (2) (West 2014). Father filed a

4

request for findings of fact and conclusions of law and then a notice of past due findings of fact and conclusions of law.

### III. Findings of Fact and Conclusions of Law

In his first issue, Father argues that the trial court erred by not filing findings of fact and conclusions of law. However, in an accelerated appeal, "[t]he trial court need not file findings of fact and conclusions of law but *may* do so within 30 days after the order is signed." Tex. R. App. P. 28.1(c) (emphasis added); *see also* Tex. Fam. Code Ann. § 263.405(a) (West 2014) (providing that a termination appeal is an accelerated appeal governed by the procedures for accelerated appeals in civil cases under the rules of appellate procedure); Tex. R. App. P. 28.4(a)(1) (stating that appeals in parental termination cases are governed by the rules of appellate procedure for accelerated appeals unless otherwise provided by rule 28.4). *Compare In re D.H.*, No. 02-05-00179-CV, 2006 WL 133523, at *1 (Tex. App.—Fort Worth Jan. 19, 2006, no pet.) (mem. op.) (holding that former rule 28.1 applied only to interlocutory appeals), *with* Misc. Docket No. 11-9251 (Dec. 12, 2011) (amending rule 28 to add rule 28.4, "Accelerated Appeals in Parental Termination and Child Protection Cases"), *available at* http://www.supreme.courts.state.tx.us/miscdocket/11/11925100.pdf.

Further, in *D.H.*, even before rule 28 was amended to apply to termination cases, we held that a failure to file findings and conclusions was harmless when a termination order sets out the termination grounds and the record allows the appellant the opportunity to fully brief the sufficiency of the evidence to support

5

those grounds for our review. 2006 WL 133523, at *2. Because the rules provide for the trial court's discretion with regard to filing findings of fact and conclusions of law in an accelerated appeal like this, and because the same reasoning in *D.H.* applies here to show that, even if the trial court abused its discretion, Father suffered no harm, we overrule Father's first issue. *See id.*

## IV. Termination of Parental Rights

In her third issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's findings under subsections (D), (E), and (O) of section 161.001(1). In his second, third, and fourth issues, Father challenges the factual sufficiency of the evidence to support the trial court's findings under the same subsections as Mother and to support its best interest finding. Along with the best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *See In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). Therefore, as set out below, we reach only Mother's and Father's complaints with regard to subsection (E) and Father's complaint about the trial court's best interest finding.

### A. Standards of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may

6

not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (West 2014). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2014). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.* We cannot weigh witness credibility issues

7

that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated a subsection of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

Further, with regard to the best interest finding, while there is a strong presumption that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014). We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground

8

and best interest.  *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the best interest of the child;

(F)     the plans for the child by these individuals or by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.  *Id.*

9

**B. Evidence**

**1. Mother's and Father's Backgrounds**

Mother started smoking marijuana when she was nine or ten years old. In 1997, she separated from the father of her three now-adult children,[3] and in 2002, she became addicted to methamphetamine. Mother's methamphetamine use caused her to lose short-term memory, but she said that this would not affect her ability to care for M.P. Mother pleaded guilty to possession of methamphetamine in 2002 and received deferred adjudication community supervision but continued to use methamphetamine, breaching her community supervision's terms and conditions, which she said were "too much of a hassle." Mother eventually served six months in state jail for the possession offense.

Mother subsequently committed a burglary while high on methamphetamine, which resulted in the 2005 conviction for which she served three-and-a-half years' confinement. Mother claimed that her last methamphetamine use had been around 2008 but she tested positive for THC, methamphetamine, amphetamine, and opiates on September 9, 2013, during the pendency of this case.

---

[3]When Mother and the other children's father separated, the oldest child was five or six years old; the children stayed with their father because Mother was between jobs and, at one point, was homeless. Six months later, Mother married another man, to whom she was still married at the time of the termination trial in 2013, even though she also claimed that she and Father had a common law marriage.

Mother and Father's relationship began around September 2009, and they moved in together two months later. M.P. was born around a year later, on November 16, 2010. Mother and Father used marijuana together before and after M.P.'s birth and during the pendency of this case.

Mother said that during the first three or fourth months of her pregnancy with M.P., she smoked marijuana to quell her nausea and stimulate her appetite. When she tested positive for marijuana six months before M.P.'s birth, she stopped smoking it "[b]ecause [she] didn't want any hassles." Father said that Mother smoked marijuana only once or twice during her pregnancy with M.P., that she quit when she was reprimanded for it, and that they had not known that Mother was pregnant until after she smoked the marijuana. When M.P. was born, CPS received a referral based on Mother's earlier positive drug test. According to Mother, CPS closed the case when she told the CPS investigator that she and Father would do a drug treatment program through their church.

Mother said that after M.P. was born, she asked Father not to smoke marijuana around her because that would help keep her sober. However, Mother and Father subsequently continued smoking marijuana together while caring for M.P. Mother said that when M.P. was in the house, she and Father would ask Mother's sister to look after M.P. before they went outside to smoke marijuana.[4]

---

[4]With regard to both parents smoking marijuana while M.P. was at home, Father said, "It was only on a couple of occasions. And, you know, people make mistakes and then life goes on." Father said that because he was not a doctor,

11

Mother said that in retrospect, leaving M.P. inside while they went outside to smoke marijuana was wrong and that if she could do things differently, she would not do that again. However, Mother also said that she did not think that smoking marijuana when she was M.P.'s primary caregiver was endangering because it did not impair her judgment. Both parents said that only a few minutes would elapse between smoking marijuana and returning inside to take care of M.P. Mother said that M.P. never experienced any injuries when this happened, and Father said that he did not think that it was a bad idea despite his acknowledging that depending on the drug's potency, marijuana could impair his ability to make good decisions. Mother said that she did not see marijuana as an illegal drug but rather as "a natural healing herb," and that in the last year, she had smoked it to address "the common cold, you know, whatever."

Father, who was around forty-three years old at trial, testified that he had started using drugs when he was around thirty-six years old after leaving a white supremacist "church," but he also said that he had been smoking marijuana for medicinal purposes for around ten years. Father joined the white supremacist group when he was fourteen years old and lived in the group's compound for sixteen years; he revealed in his psychological evaluation that he had left home

---

he could not judge whether Mother had been impaired at that time; he said that he had not been impaired but rather "comfortably numb."

12

at age twelve, that his birth mother was a murderer, and that his father had been a pedophile and an abusive drunk.[5]

Father's paranoid schizophrenia was not diagnosed until he was forty-two years old, but his symptoms began when he was ten or eleven years old. Father also suffered from bipolar disorder, depression, anxiety, post-traumatic stress disorder, and a personality disorder, and he had severe and noticeable mood swings, panic attacks, anger outbursts, and hallucinations; he denied having a quick temper.

Father was taking Depakote and Risperdal twice a day for his chemical imbalance, Xanax three times a day for anxiety, hydrocodone as needed for pain, and Trazodone at night for insomnia. Father did not always take all of his psychotropic medications, and he did not recall whether he was taking them when he smoked marijuana a few weeks before trial. He acknowledged that sometimes he forgot to take some pills and that he relied on Mother to get them ready for him to take.

Father was on social security disability insurance (SSDI) income for his mental disability but stated that he could also earn money by washing car

---

[5]Father said that he had no felony convictions and had only two or three misdemeanor convictions. One of his convictions was for public intoxication in 2006; he was arrested for driving without a license in 2011 or 2012, and he had a pending charge for resisting arrest. Father had also been arrested for terroristic threat but said that it was a false charge that had been dropped.

windows and selling and trading guns and tools.[6]  His activities included listening to his scanner—he described himself as a "civil rights activist" and said he would drive out to tell people about their rights when he heard about arrests—conducting internet research for five to ten hours at a time, playing his guitar, collecting and polishing rocks "all day," and studying law.  Father also believed in a number of conspiracies.  Father said that he smoked five to ten cigarettes a day when he was under stress and three to five when he was not; he claimed that cigarettes did not cause cancer but that milk did.

During trial, Father gave the following testimony:

> Q.   Was there an event in your life that triggered your beginning of drug use?
>
> A.  Well, really it wasn't drugs.  I got into marijuana because I got to researching cures for cancer, and I ran into a doctor on the Internet that—that had proved that he—he healed 300 people with brain tumors, terminal brain tumors, that were diagnosed from the National Cancer Society.  And he healed them with THC.
>
> Q.  Did you believe that you had a brain tumor at the time?
>
> A.  We all have cancers, sir.  My doctor told me that.
>
> Q.   So this smoking marijuana was kind of a preventative measure for you; is that right?
>
> A.   It was that and it was new in my life and it was a stress relief.  It helped me relax and work with my anxiety.  After my back surgery, I did more research, and it's really good for chronic back pain and—and other areas of your life.  That's why God put it here.  He put it here for us to utilize.

---

[6]Father said that he could earn between $75 and $350 per week in addition to his SSDI income.

Q.  All right.  Were you taking these other psychotropic medications at the time that you were using this marijuana?

A.  At that time, I—I've been on psychotropic medications since I was 12 years old, sir.

Q.  I understand.  But, I mean, you don't—I kind of gathered from your—

A.  From time to time, yes.  *I did smoke it while I was taking my medication*, yes, sir.

Q.  And you were—you don't really take all your medicine all the time.  Is that—is that fair to say?

A.  No.  *I take my medicine all the—90—95 percent of the time.*  [Emphasis added.]

Father said that he knew it was against the law to possess marijuana, that smoking it was "a spur of the moment thing," and that he did not do it every day.

Mother claimed that Father was predictable and experienced no changes in personality or behavior when under the influence of marijuana.  Mother also said that Father's anger had never been directed at anyone but CPS "because they were destroying our family," and she denied that Father had had ties to a white supremacist group.

## 2.  M.P., Before and After Removal

M.P. was born with bilateral club feet, for which she began treatment at two weeks old.  Two months before M.P. went into foster care, CPS received a referral alleging medical neglect of M.P. based on her failure to wear her

15

prescribed leg braces.[7] At thirteen or fourteen months old, M.P. was supposed to wear the braces "24/7, as it had been prescribed for her," but Mother said that M.P. "would scream and yell and cry for—at the most—the most [they] could bear was two hours." She also said that Father could only take five or ten minutes of M.P.'s crying because "he feels the pain too" when M.P. cried.

At trial, Mother said that she had conveyed her concerns about M.P.'s discomfort and frustration with the braces to M.P.'s doctor, who maintained the 24/7 prescription. Mother said that she and Father would try to put the braces on M.P. but that M.P. "would scream and yell like she was being tortured," and there was only so much Mother could take. Mother said that if the braces or shoes were hurting M.P., then it was not neglect to remove them. Father said that when M.P. would cry, they would feel sorry for her and take the braces off.

During the medical referral investigation, Father told the CPS investigator that he occasionally smoked marijuana, that his last use had been the month before, and that people were plotting against him; neither Father nor Mother was willing to take a drug test. Father told the CPS investigator that he was interested in family-based safety services (FBSS), a program that provided the same type of services that he and Mother received in this case—parenting classes, counseling, drug resources, and other services—but allowed the child to remain in the home or with other family members. Father wanted the FBSS

---

[7]The CPS investigator testified that M.P.'s doctors had expressed concern that M.P. was not wearing her braces.

services to improve his parenting skills and to help him and Mother stop arguing in front of M.P.

CPS initially closed the case on June 1, 2012, with a referral to a Catholic Charities program, but a week later, on June 8, 2012, Father confronted Mother about a loaded syringe, and Mother pulled a knife on him during the ensuing argument.

Mother said that the syringe contained M.P.'s antibiotics.[8] One of Mother's relatives called the police at 1:15 p.m. to report that Mother and Father had been arguing since 11 a.m.; Mother was arrested for aggravated assault with a deadly weapon around 1:50 p.m. and taken to JPS on a mental health hold. Mother testified that Father had lied when he reported to law enforcement that she had threatened him with a knife, but she told the CPS investigator that she had pulled out the knife to try to stop the argument.

With regard to the incident, Father said that Mother would not listen to him; he stated,

> She was probably angry with me because—you know, I—I don't neglect my family. But I read the Bible a lot. I read—you know, I try to read ten chapters a week, and—and I have other things going for me, you know. I have a hobby in studying, you know, the law, and I just—I do—I do ignore her sometimes, you know.

Father said that on this occasion, he had been doing research on the internet for three days in a row for over five hours, "ten hours sometimes." The argument

---

[8]Father testified that he had jumped to conclusions because of his paranoia and Mother's history of drug use.

17

had been over his spending time on his project instead of with her and M.P. Father said that Mother "was like, 'You're either on your computer or you're playing your guitar, and I want some attention.'" Father also said that Mother felt like when he did pay attention, all of the attention was to M.P. and not to her. Father testified that Mother told the police that "if [he] made her mad enough she was going to stick [him] like a stuck pig." Father said the police took Mother to JPS because that was a dangerous statement to make.

Father called CPS for permission for him and M.P. to stay at his relatives' house; he told the CPS investigator that he did not want to stay with Mother's family because he believed Mother's family members were devil-worshippers.[9] In light of Mother and Father's fight and the police involvement, at that point in time, CPS formed a new plan to refer the case to FBSS instead of Catholic Charities.

Later that evening, however, Father was accused of shaking M.P. and causing her to vomit. Father's January 16, 2013 psychological evaluation recited that Father claimed the baby-shaking allegations were false:

> [Father] stated his uncle basically said that [Father] shook his daughter and slapped her face and that [Father] had said to his daughter, "you better eat[,] you little bitch." [Father] denied that he engaged in such behaviors. . . . [Father] stated [that] . . . he had

---

[9]Father clarified at trial that Mother's family members were not devil worshippers "[b]ut they don't believe in God and Jesus Christ, like [he does], and—and—if—you're either a child of God or a child of the devil." Father said that Mother's family members were children of God and that he had been upset when he said that they were devil-worshippers.

18

called his CPS caseworker from a previous referral in order to get help for his family. He stated he needed to get his baby to a safe haven because his wife had been taken to the tenth floor of JPS for screaming and yelling and she had a knife on her and said she wished she had cut him like a pig. At the time they were living with [Mother's] mother and they were all arguing because his wife wasn't doing the dishes. He stated at that point when his wife was taken to JPS, he left his mother-in-law's house and went over to his aunt and uncle's home and that's when they had some difficulties. [Father] stated basically that's when he was lied upon and his uncle said that he had shaken his daughter and the authorities were called and his child taken to the hospital. Due to the allegations, CPS removed his daughter from the hospital even though there was no evidence of abuse according to [Father]. While at the hospital, [Father] stated he was told by the investigator to sign paperwork so his daughter could leave the hospital and he didn't realize what he was signing because he didn't read the paperwork in which he was allowing his daughter to be taken into CPS custody. [Father] described how he stood in front of the door and he put a detective in a headlock and pushed against the door and it took three uniformed officers to calm him down and let the detective go.

Father said that he did not shake M.P. He said that one of his cousins was in the house when Father woke up and asked Father if he had shaken the baby.

Father said,

And then when they told me what was going on and asked me if I had shaken the baby, I took a combat stance, and I asked him who hurt my baby. And I was upset and I wanted to get down to the bottom of it. And I felt like if something did happen, that it may have been my uncle or my cousin. But after I talked to [Mother] and she told me, you know, the baby normally throws up when she gets nervous—and there was four people there holding her that she didn't know, which is the truth. And, you know, I realized that I took the wrong action, and I should not have—I should have been more civil about it.

19

Father said that when he takes his medicine at night, it makes him groggy but that he remembered everything that occurred even though everything after he woke up that night was like a dream.

A police officer drove Father to Cook Children's Medical Center. The CPS investigator went to the hospital to investigate the new referral alleging physical abuse and neglectful supervision by Father and neglectful supervision by Mother. Father told the CPS investigator that if anything had happened to M.P., his uncle probably did it. CPS found the allegations "reason to believe."

When the CPS investigator told Father that CPS had decided to take M.P. into foster care,

> [Father] told [her] that everyone had plotted against him to take [M.P.] away, that [the CPS investigator] worked for the devil. [Father] . . . stood in front of the door and indicated that he—no one was going to leave. He, for a moment, became a little aggressive with the detective, and then he began asking [the CPS investigator], the detective, some hospital security officers if they would be willing to take [M.P.]

Father said that when the CPS worker told him, "We're going to take [M.P.] with us now," he stood in front of the door in a combat stance and said, "No one's leaving this room. And I mean it." He said that the next thing he knew, he was face down on the floor with three detectives on him. Father said that he understood why they were taking the child but that "they should have done more of an investigation of whoever made the allegations first." He agreed, looking back, that he had probably overreacted. Father had to be escorted from the hospital.

20

### 3. The Parents' Service Plans

Father did not take his medication before starting his psychological evaluation, and he was initially extremely belligerent and agitated. He frightened the other clients and was cautioned that if he did not settle down, he would be asked to leave the premises. At that point, Father confessed that he had not taken his medication because he wanted all of his faculties; he took his medication and within twenty to thirty minutes, he became calmer and more cooperative. Father told the psychologist that his medications kept "the voices away" but that sometimes he stopped taking them because "he d[id] not want to be a zombie."

The psychologist summarized her findings on Father as follows:

> Based on personality testing, clinical interview, and behavioral observations, [Father] presented as a person who has serious and chronic mental health issues that become pronounced as the stress in his life increases. [Father] is vulnerable to acting out and aggressing in his environment very easily due to his low frustration tolerance, poor coping skills, and his tendency to lose touch with reality. [Father] presented as a person who has symptoms of schizophrenia and he also has a mood disorder in the form of a bipolar disorder where he experiences significant bouts of depression as well as manic episodes. [Father] reported a number of symptoms that reflect a psychotic process. Compounding his problems are his mood issues and very long-term personality issues. [Father] meets the criteria for chronic and serious mental illness and will need ongoing psychiatric and counseling services.

> [Father] has significant anger management issues. [Father] admitted sometimes he feels as if he must injure either himself or someone else. Additionally, [Father] indicated he has been so angry at times that he has hurt someone in a physical fight. [Father] reported feeling tense a lot of the time, people often tell him to calm down, he is easily angered, and he is still angry about things that

21

happened to him in the past. [Father] admitted when angered he tends to yell or cry, his anger has caused problems at work and at home, and his anger frightens himself sometimes. He would like help learning to manage his anger. Thus, it is imperative due to his anger issues coupled with his mental health concerns that he actively participate in treatment, stay on prescribed medication, and have appropriate supports in place to help him during difficult times.

Additionally, [Father] presented as a psychologically immature person compared to same aged peers. It appears [Father] has little awareness of how disturbed his thinking and reasoning become and the impact his behaviors have on others. He shows little awareness of the consequences to others because of his behavior. [Father] tends to be a person who has a poor tolerance for stress and pressure. When he becomes overwhelmed, he may demonstrate manic or depressive behaviors or lose touch with reality and demonstrate illogical and irrational thought processes. Such behaviors may significantly affect the parent/child relationship when he has severe mood swings and acts out in his environment due to poor impulse control. In fact, [Father] is likely to be described as highly impulsive. During periods of increased stress, [Father's] psychiatric issues will likely increase.

. . . .

[Father] has strange and peculiar thoughts. He often gets confused. He has strong opinions that he expresses directly to other people. He likes to let people know where he stands on things and he finds it necessary to stand up for what he thinks is right or if people do something that makes him angry. He finds it difficult to relax and interrupt his obsessive ruminations about his fears and problems. Sometimes some unimportant thought will run through his mind and bother him for days. He has often lost out on things because he could not make up his mind quickly enough. He may experience periods of impulsive and inconsiderate behavior followed by guilt feelings and self-criticism. At times he cannot seem to stop talking.

. . . . [Father] loses touch with reality at times, he is highly suspicious of the motives of others, and if he doesn't take his medication he can become verbally and physically aggressive when he feels threatened[,] whether real or imagined.

22

The psychologist recommended that M.P. remain in a safe and protected environment and noted that "[d]ue to the reality of [Father's] current situation, there is a great likelihood that he will have difficulty completing the recommended services in a short time frame and there is concern about his lack of stability and pattern of impulsive and aggressive behaviors." She also noted that "the prognosis is poor at this time for [Father] to be able to parent independently."

The psychologist summarized her findings on Mother as follows:

> [Mother] presented as an individual who is open about her past experiences but who lacks insight into her feelings and behaviors. Thus, she is likely to engage in maladaptive behaviors repeatedly as a result of this. Therefore relapse is a serious potential for [Mother]. Relapses and remissions are highly expected, especially due to the fact that she has been using illegal drugs since she was 9 years of age. [Mother] has a chronic and extensive history of legal difficulties as well as multiple relapses[] and relational problems. [Mother] has little stability in her home and hasn't worked since 2005. She has demonstrated poor decision making skills in the past and this has affected parenting decisions as well. [Mother] has a chronic history of drug use and the effects drugs have had on her mood disorder is another issue.

> . . . .

> . . . . [Mother] admitted when angered she yells or screams and cries. Her anger has caused problems in the home and frightens others and she would like help learning to manage her anger. [Mother] admitted she sometimes feels out of control with her anger and says things she regrets when she's angry. [Mother] admitted there are times when she had temper outbursts she could not control and this has led to problems. . . . [Mother] reported being deeply in love with [Father] but his mental health issues can create stress at times and this leads to arguing and conflicts. [Mother] and [Father] have a highly co-dependent relationship. . . .

> [Mother] attributes her past heavy use of methamphetamines to her being restless and the uncontrolled movements she

23

experiences. She also has trouble concentrating, trouble remembering things, and her mind goes blank. . . . [Mother] is the type of individual who when overwhelmed by stress can become vulnerable to regressing to old habits, which can affect her reasoning and lead to impaired judgment. In the past, as a way to cope, [Mother] has turned to drugs to deal with her emotional pain. In fact she relapsed on marijuana recently.

. . . . Unfortunately, the prognosis for change is poor at this time due to [Mother's] significant substance abuse issues. Although she may agree to treatment to avoid something more unpleasant (e.g., loss of custody of her child), she generally is going to struggle with sobriety until she learns to process her emotions better, to make better decisions, and engages actively in maintaining her sobriety by participating in relapse prevention groups, NA meetings, working a 12 step program and establish[ing] a relationship with a sponsor.

Mother said that CPS referred her to individual counseling and anger management and that she had been through three counselors—one every three or four months. Father said that he had completed the anger management class but that he did not receive a successful completion because of his absences. Father stated that he and Mother had missed an anger management class during the first session because they were flying kites and forgot about the class. But Father told his counselor that he and Mother had been flying kites and "just did not want to leave," and that they did not care about being discharged and would just start the class over again.

Father's counselor testified that Father was discharged from anger management the second time for exhibiting anger in a way that scared and intimidated other clients. Although Father was given the opportunity to finish the course individually, he did not take that opportunity.

24

Father conceded that he did not successfully complete his individual counseling but said that it was because his counselor had quit because she agreed that CPS was plotting against him. Father's counselor testified that he counseled Father from July to November 2012 and that Father was not successfully discharged from individual counseling because he had stopped attending and had not met his therapeutic goals. He described Father's outbursts, stating,

> He would become very loud. He would at times—sometimes he would stand up sometimes in the sessions if he didn't like things that were being talked about or things that were going on with CPS. He would at times call names, curse. He would get very fidgety. He would become very, like, more—much more animated and agitated physically, as well. And sometimes it would take a while to calm him down from those.

The main focus of Father's angry outbursts were directed at his counselor, the government, CPS, his CPS caseworker, Mother, and Father's father. Father's counseling notes reflect frequent ranting by Father, including "several bizarre, wild tangents about the government, the Freemasons, and other people watching him and/or trying to poison, harm, and/or control him."

Mother claimed that she and Father did not start having problems until a CPS aide said that she had been threatened, and they both denied having threatened anyone from CPS. Father said that he did not pull a knife on a CPS case aide and that he "would never threaten nobody [sic] with a weapon." He testified that he had brought out his pocket knife to cut some tape from a box of

25

play tents that they had brought for M.P. However, Father's counseling notes reflect that in November 2012, Father went

> into how he believes that CPS is trying to take his baby from him and ma[d]e[] wild claims that the therapist and his caseworker are in cahoots because they refer to each other by first name. He again went off on a rant about how unhappy he is with CPS and the way that he feels they are holding out on them in an attempt to take their child. *He made many other wild threats of violence against the therapist, Merit, CPS, and his caseworker that the therapist believes to be simply his way of venting his emotions, but also demonstrate[s] how very little progress he has made in learning how to reign [sic] in his emotions and how he expresses them. These also merit some caution as [Father] does have access to weapons and has a history of violence.* It was again pointed out that he knows these things to simply be untrue and he was encouraged to try finding the words that more appropriately express what he feels about the CPS case, instead of just saying wild things that make him look and sound "crazy." Instead of gathering himself as he has in most past sessions, he continued to rant and become more agitated as he talked mostly to nobody or himself. *It was during this ranting that he stated that he slapped his wife last night when she was yelling at him for having the TV volume turned up too high at 4:00 AM. He followed this up with a comment that he would have done the same with a child as well, which is highly concerning as he has a history of doing this with his older daughter.* [Emphasis added.]

Father said that he did not recall telling his counselor that he had slapped Mother.

Father denied having been banned from any CPS office and said that the visits were moved to TCFCS because the CPS case aide had made false allegations against him. Mother said that Father was banned from the CPS offices because the CPS case aide said that Father had threatened her; Mother dismissed the claim as outlandish and said Father would not have done that. Mother said she never heard Father threaten anyone at CPS.

26

The family's CPS caseworker testified that although Father had not personally threatened her, he had been extremely rude, had threatened to sue everyone, had commented that he believed CPS was holding M.P. hostage and that the State was being paid to keep his child from him, and had asked her how to spell her name correctly so that he could run her background. Father had been told that he could not record the CPS employees during visits with M.P. but he would try to question them and use his phone to try to record their responses. The CPS caseworker said that she told the CPS case aide to ignore Father's antics as long as he did not do anything to put M.P. in harm. When a security guard told Father that he could not record and to turn off his phone, Father claimed that the guard had pulled a gun on him and waved it in his face, which the CPS caseworker said was not true. Father was banned from the CPS offices after he took a picture of the CPS caseworker, the CPS case aide, and a security guard at the end of his visit. Mother claimed that their visits at CPS would have gone beautifully if the CPS workers had not taunted Father to the point of anger by remaining in the room during the visits.

Mother and Father had three visits with M.P. at TCFCS. Father said that his visits at TCFCS were stopped because he had been recording them. Father said that when the CPS worker tried to tell him that he could not record the visits, he told them that he had downloaded the recording laws for the State of Texas onto his phone and that he "was perfectly within [his] rights." Father said that the CPS caseworker told him, "If you don't turn off the recorder, we're going to

terminate your—your visits." Father said he had wanted to record the visits for memory and for his and his family's protection. Mother said that they had been doing nothing wrong by recording their sessions with M.P.

In contrast, TCFCS's assistant director testified that one or two of Father's visits had been cut short for failing to follow the rules, and that Father cancelled two or three visits when he could not obtain a ride to the facility. The assistant director said that normally, as soon as two visits are missed or there are two problems, TCFCS closes the case out so that the system can move on to another family that needs help but that TCFCS gave Father four different chances to follow the rules and have visits occur at its offices. TCFCS's assistant director said that Mother had also been disruptive during the visits by yelling at bailiffs, using profanity, and arguing with facility employees about taping or taking pictures.

One of the rules that Father failed to follow was TCFCS's no-food rule. Father and Mother had been accustomed to bringing snacks and drinks to their visits with M.P., but TCFCS did not allow food in visitation rooms. The CPS caseworker said that she told them this and that they would have to abide by the rules.[10] The CPS caseworker said that Mother did not have a problem following the rule but that Father "felt like [CPS was] violating some law, some right of not allowing him to feed his child."

---

[10]Father said that he learned that he could not bring food and drinks to the visit when four deputies came into the room and said, "No food or drinks in here."

The CPS caseworker said that after Father eventually put the food away, he became upset that the deputies had guns, although that was part of their uniforms. Once Father calmed down about that, he became upset because a deputy told him that he could not record in the visitation room and asked him to turn off his phone. Father refused to turn off his phone and was upset because there were cameras in the visitation rooms, which he felt was a violation—they could record but he could not. The CPS caseworker stated, "I explained to him that he had not seen [M.P.] in over three weeks, just to, you know, go with the flow, turn it off, enjoy his visit, and he wouldn't. So he was asked to leave." She said that if the trial court were inclined to allow Father continued access to M.P., CPS had no place where they could have the supervised visits in a safe environment.

At the last TCFCS visit, when Father signed in in the waiting area, Father told TCFCS personnel that he had brought food and drinks for his visit. He was again told that he could not bring those items into the visitation room. The TCFCS visitation services coordinator testified that she was standing behind the receptionist on the other side of the glass and heard everything clearly. A deputy was present because TCFCS had been notified of some security issues involving M.P.'s family. The coordinator stated that Father said that the deputies carrying guns were trying to intimidate him and he objected to the presence of guns in front of his child. Father made this objection more than once; the first time, he was told that it was policy that the deputies carry guns. The second time Father

29

voiced his objection, he stated, "[T]his is . . . bullshit" and said that he wanted to see a supervisor.  Father was told that he needed to calm down or his visit would be cancelled; every time he received an answer to his objections, he became louder and louder.

After Father was told several times to calm down, the deputy went into the waiting area and told Father that his visit was cancelled "because he would not adhere to the policy and de-escalate.  And at that point [Father] advanced towards [the deputy]."  Father was taken into custody, but Mother was allowed to proceed with her visit.

Father explained that he had been upset about the guns and asked for a supervisor but did not get to talk to one; instead, "[t]hey beat [him] up."  Father also said,

> I asked them to disarm themselves because I was obviously disarmed, or not armed.  And they had four officers in the room with us.  Four.  Four armed guards and a little old guy like me with a double hip replacement and double back surgery.
>
> They tackle me in front of my kid.  They should have went to jail for child endangerment for tackling a man when they had all four loaded guns in the room.  And these guys are the ones that are abusive.  I mean, they tackled a crippled man, and that carries ten years in this country, mandatory.  It's aggravated if you assault a disabled American in this country.  It's under the Americans with Disabilities Act.  Look it up and do your research, and you'll see that I was—I was wrongly treated, and I was discriminated against.  And I'm taking—I'm taking action on that.

Mother said that the bailiffs tackled Father, put him in handcuffs, and arrested him for assault on a police officer.[11] She denied that Father had done anything to provoke this response, that he had ever punched anyone, or that he had been cussing. Mother said that M.P. heard the whole thing. Father was in jail for four days.[12] Mother said that that was Father's last visit with M.P. and that she did not doubt that the police had conspired against Father.

TCFCS decided that Father could no longer have supervised visits at their office because of the disruption. Father agreed that going to jail that day was not worth it since he forfeited the chance to visit M.P. but said that he would not do anything differently because he had been invoking his rights.

At trial, Mother and Father both denied that there was domestic violence between them; Mother said that Father had only put his hands on her in anger once, and she took him to JPS for an evaluation. However, Mother told her counselor that Father's psychological issues and poor emotional management "has translated into him being abusive to her and his teenage daughter in the past."[13] And Father testified about an incident that involved his slapping his sixteen-year-old daughter, who had been living with Mother, Father, and then-

---

[11]Mother said that the officer lunged at Father to make it look like Father touched him.

[12]Father said that he recited the United States Constitution for four hours as loud as he could when he was taken to jail.

[13]Mother said that she successfully completed SafeHaven's domestic violence education program although she thought it was unnecessary.

five-month-old M.P. Father said that he slapped his daughter for being disrespectful to him. Father explained, "I'm not an abusive guy, man, but you can't let your children talk to you that way, not one time, because when you do it never stops." Father said that the slap was called for, that he had used his open hand, that he hit her hard enough to hurt her feelings, that it hurt him more than it hurt her, and that he had apologized to her later. Father said that he did not think he would ever slap M.P. Father said that CPS closed the case after he explained what had happened.

Father told his counselor that he had "had it out with the woman who runs the Shaken Baby Alliance" when he called to set up an appointment as part of his required services. He "ended up cussing her out, yelling at her, and saying other offensive things," and then she called the police to report the call and refused to see him for the presentation. At trial, Father denied that he had cussed out the teacher and claimed that he told her that he was willing to take the class but did not want to sit next to anybody that may have shaken, hurt, or killed their baby because he could not promise that he could control himself. Father denied having threatened her when she told him that this would disqualify him from the program; he said that he told her that it was "BS." When asked whether he was aware that the teacher had made a police report alleging simple assault based on her conversation with him, Father said, "There were no charges filed," and he said that he had not received any calls from the police about the alleged report.

32

Mother claimed that she was successfully discharged from anger management, but her counselor, who managed the course, testified that Mother did not successfully complete it even though she had been offered the opportunity to attend the course without Father. Mother said that she and Father were not successfully discharged from couple's counseling. In the two weeks before the trial, Mother did not participate in any services; her last visit with M.P. had been three weeks before trial because her mother's car had broken down; she missed around ten visits with M.P. throughout the case.

Mother was arrested for theft around two weeks before trial. She stole shampoo, conditioner, and toiletries from Wal-Mart and received time served. Mother said that she had stolen from Wal-Mart because she and Father "were broke because CPS ha[d] made [them] do all this." Even though the services were provided to them at no cost, she and Father had had to pay for gas to travel to and from services that were outside of where they lived and sometimes they would miss a service because they could not afford the gas to get there.[14] However, Mother also acknowledged that both she and Father continued to smoke cigarettes—she smoked half a pack a day and did not keep count of how many Father smoked. During the case, Mother also "sat out tickets" in jail for a week for having no registration, no inspection, or insurance for her car. She said

---

[14]Mother explained that they had to do five or six CPS services a week, driving sixty miles there and sixty miles back each time, with gas costing from $50 to $100 per week. Mother said that Father had started borrowing money from friends and family to put gas in the car.

that her car had stopped running in October and still did not have insurance or valid registration. She also said that Father did not have a valid driver's license but that she let him drive anyway.

Father received $674 per month in SSDI income. Mother said that when they had lived as a family, they had been able to meet their needs and M.P.'s on this income, supplemented by Mother's earnings from recycling, resale of garage sale merchandise, and cleaning houses. They bought the trailer in February 2013 with Mother's tax refund check. Mother said that Father was still living in the trailer and that it had been baby-proofed and was ready for M.P. to come home to. However, Father testified that he had been living with S.B., his SSDI payee and conservator, during the three weeks before trial. Father said that he did not find the RV park a suitable place for M.P. to live. Father said that he and Mother were living apart because that was what CPS wanted but that he wanted to have Mother back home with him, cooking and cleaning for him.

In addition to M.P. and his sixteen-year-old daughter, Father also had a twelve-year-old daughter; he was not paying child support for any of his children at the time of the trial. His sixteen- and twelve-year-old daughters lived with their mothers, and Father said that each one's mother and step-father made plenty of money.[15] Father said that he had not paid any child support to CPS for M.P.

---

[15]Father acknowledged that he did not receive a tax refund the preceding year because he owed around $9,000 in child support for the twelve-year-old child.

because CPS had not asked him for any and that he and Mother had been afraid to offer because they did not know if they could do that. Father said he otherwise would have gladly paid child support for M.P. and would have done what he could to make the money to do it.

### 4. Best Interest

Father stated that CPS had done nothing but threaten him that if he did not work his services, he would never see M.P. again. He said that he believed the threat, but then when asked why, if he believed it, he had not done the services, Father said that the only services he had not completed were the ones "in the buildings where they banned [him] because of false allegations from their workers." Father said that he was considered noncompliant because he believed in his rights and stated, "If I believe it violates my rights, I don't do it." He wanted to raise M.P. "to stand up for who she is and be aggressive . . . because people don't understand."

Father said that he was asking for sole custody of M.P. but that he did not mind having joint custody with Mother because "she's a good mother." He added that he was sure that if M.P. came home, Mother would not do any more drugs. Father said that despite his pleadings that it would not be in M.P.'s best interest to have joint custody with Mother, he thought it was in M.P.'s best interest to have her parents together and for them to share custody. Father said that CPS had been telling him and Mother to split up since the case began and stated, "[I]t's bull that y'all did that. Y'all can't control who we're with. We love each

35

other." He further stated, "And I don't think it's right that y'all have control over my children, my wife, my money, everything. And that's what it sounds like you're trying to do here, and I really am getting offended by your questions."

Regarding M.P., Father said, "I love her. She's my daughter. I'm—what are you asking me these stupid questions for? She's my daughter, I love her, I've never harmed her, and I never will." He also said, "I'm a great father."[16] Father said that if M.P. were returned to them, he believed that he and Mother could provide a safe and stable home for her and that he and Mother could stay on their medications. Father said that he had no concerns about Mother being abusive or neglectful of M.P. and said that he had never known M.P. to be in a dangerous situation while under their care.

When asked whether Father was currently ready to get M.P. back, Mother said, "Huh? I don't see why not." Mother said that she had no problem with Father being M.P.'s primary caregiver, that she trusted him entirely, and that his outbursts did not concern her. Mother said that it would not bother her to learn that Father had petitioned for sole custody of M.P. Mother said that Father was an excellent parent and that it would be in M.P.'s best interest to return her to him.

---

[16]Father described his defects as a parent as being overprotective and having expectations that were a little high. He testified that he anticipated getting M.P. back because he and Mother had been truthful and were good, loving, and honest parents and had answered all of DFPS's questions "[n]o matter how ridiculous."

Mother also said that while she wanted M.P. to come home to live with her, she did not realistically see that happening because she did not have a job, it would take two or three months for her to be able to provide a home for the child, and it was not in M.P.'s best interest to go back to Mother immediately because she was not working. Mother said that she understood that M.P. had a continuing condition that required treatment and that she would continue to get treatment for the child.

Mother and Father's counselor said that his concern about Mother's ability to be M.P.'s primary caregiver was Mother's continued relationship with Father. Based on his interactions with Mother and Father and his training and experience, he could not say how long Mother and Father would need to engage in treatment before they would be adequately suited to care for a small child and agreed that it could take an indefinite amount of time. Based on his interactions with Father up until the point that Father was discharged from counseling, he would not recommend to the trial court that Father have custody of a young child. His concerns were, among other things, Father's continued issues with anger and conflict management, poor parenting skills, lack of understanding and patience, and medication management.

The CPS caseworker opined that neither Mother nor Father had the skills to provide a safe and stable living environment or to properly parent M.P. She stated that M.P. had been placed in a dual-licensed, adoption-motivated home since being taken into foster care in June 2012, that she saw no impediments to

37

adoption by the current placement if Mother's and Father's parental rights were terminated, and that the foster placement's plan was to adopt M.P. if she became available. She had seen M.P. interact with the foster placement and said that there appeared to be a bond between the child and the caregiver that was appropriate in both directions, that the placement had the ability to meet M.P.'s emotional and physical needs, now and in the future, and that she had no concerns about the foster family's parental abilities. In contrast, she said that she had concerns about Mother's and Father's abilities to meet M.P.'s emotional and physical needs and that if M.P. were placed with either Mother or Father, she believed that there would be emotional or physical danger to the child now or in the future.

The CASA worker reported that she had visited M.P.'s foster home around sixteen times. She described M.P. as a happy, beautiful, sweet girl who loves to sing and dance and who is significantly delayed in her speech. M.P. was supposed to wear her leg braces twenty-four hours a day and the CASA worker had seen the foster mother struggle with the child to put them on even though M.P. would cry and throw herself on the floor. M.P. received speech therapy ten times a month and physical therapy twice a month. The CASA worker reported that M.P. had made major improvement during the last nine months with her speech and that it helped that the foster mother was a speech pathologist. M.P. had also learned to walk, had adjusted well to her new braces, and had seen improvement in her feet.

The CASA worker observed thirteen of Mother's supervised visits with M.P. and noted that during the visits, Mother had minimal interaction with the child. Four visits were cancelled because the parents did not show up, and Mother had most recently failed to appear at her November 1, 2013 and November 8, 2013 visits.

The CASA worker noted that Father had had separate weekly visits with M.P. and that he interacted well with the child and M.P. seemed to respond well to him. The CASA worker also noted that Father had been defiant of the visitation regulations, trying several times to walk out of the room with the child and, when redirected, had yelled at the CPS case aide. Around August 2013, Father was banned from attending visitations due to his misconduct and aggressive behaviors during visits. The CASA worker recommended terminating both parents' rights to M.P.

## C. Endangerment

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of

39

conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. To determine whether termination is necessary because of endangerment, courts may look to parental conduct both before and after the child's birth. *J.T.G.*, 121 S.W.3d at 125 (citing *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)). A mother's use of drugs during pregnancy may amount to conduct that endangers the physical and emotional well-being of the child. *Id.* (citing *In re K.M.B.*, 91 S.W.3d 18, 25 (Tex. App.— Fort Worth 2002, no pet.)). The specific danger to the child's well-being may be inferred from parental misconduct alone. *See Boyd*, 727 S.W.2d at 533; *see also In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) (stating that the factfinder was not required to ignore a long history of dependency and destructive behavior, including abusing drugs and alcohol, in considering endangerment); *In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g) (stating that evidence of conduct before child is born, as well as evidence as to how a parent has treated another child, is relevant regarding whether a course of conduct under section 161.001(1)(E) has been established).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child. *R.W.*, 129 S.W.3d at 739. Further, "although mental incompetence or mental illness alone

40

is not grounds for terminating the parent child relationship [under section 161.001(1)], 'when a parent's mental state allows [him or her] to engage in conduct [that] endangers the physical or emotional well-being of the child, that conduct has a bearing on the advisability of terminating the parent's rights.'" *Maxwell v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00242-CV, 2012 WL 987787, at *9 (Tex. App.—Austin Mar. 23, 2012, no pet.) (mem. op.) (quoting *In re C.D.*, 664 S.W.2d 851, 853 (Tex. App.—Fort Worth 1984, no writ)).

Mental health issues that are frequently untreated, especially when combined with delusions, hallucinations, a diagnosis of paranoid schizophrenia, and an unwillingness or inability to appreciate the consequences of failing to treat those issues, can present a substantial risk to a child's safety. *See id.* at *9–11 (finding evidence factually sufficient under section 161.001(1)(E) when, among other things, mother failed to treat her severe mental illness during the pendency of the proceedings even though she was aware that doing so was essential to reunification with child); *see In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (considering domestic violence, mother's mental state, and her history of noncompliance with her medication as factors endangering the child's well-being); *C.D.*, 664 S.W.2d at 853 (finding evidence sufficient to support endangerment when mother was on medication for paranoid schizophrenia at the time of trial, had been violent in the past because of her condition, had attempted suicide and made threats to attempt suicide, had been hospitalized over twenty times, and had destroyed property and attempted to

41

steal a helicopter). A parent's failure to take medication can expose a child to endangerment of her emotional or physical well-being. *See In re L.L.F.*, No. 02-11-00485-CV, 2012 WL 2923291, at *15–16 (Tex. App.—Fort Worth July 19, 2012, no pet.) (mem. op.) (holding evidence of endangerment sufficient based on mother's failure to take her bipolar medication, her guarded long-term prognosis without medication, and her drug use while pregnant, aggressive behavior, and criminal convictions); *see also In re M.A.P.*, No. 02-11-00484-CV, 2012 WL 2036457, at *8–10 (Tex. App.—Fort Worth June 7, 2012, no pet.) (mem. op.) (holding evidence of endangerment sufficient when mother continued to associate with violent father, used marijuana around infant and during the CPS case's pendency despite knowing that using it exacerbated her schizophrenia, and failed to take her mental-health medication). "Domestic violence, want of self control, and propensity for violence may be considered as evidence of endangerment." *J.I.T.P.*, 99 S.W.3d at 845.

The record is replete with evidence to support the trial court's findings. Father, a bipolar-schizophrenic former white supremacist was threatening, belligerent, and unable to prioritize doing what was necessary to secure M.P.'s return to him with his obsessions and his temper. The record reflects that despite Father's love for M.P., he failed to take his psychotropic medications as necessary to control his mental illness or to exercise restraint in a variety of situations—demonstrated in no small part by his behavior during trial and on several occasions during the case with counselors, CPS and TCFCS employees,

42

and law enforcement personnel. It also reflects that Father frequently engaged in threatening behavior; that he used marijuana before the child's birth, when caring for the child, and after her removal; and that he neglected the child's needs with regard to the medically prescribed treatment for her club feet. Other than Mother, no one recommended returning M.P. to Father or testified that he had the skills necessary to care for a young special-needs child. Therefore, we conclude that the evidence is factually sufficient to support the trial court's endangerment finding as to Father's conduct under section 161.001(1)(E), and we overrule Father's third issue. *See H.R.M.*, 209 S.W.3d at 108.

Mother, a former methamphetamine addict who had spent several years in jail for various crimes, endangered M.P. by using marijuana while pregnant and while caring for the child, by failing to provide the child with appropriate medical treatment for her club feet, and by continuing to use drugs and committing new offenses resulting in incarceration during the pendency of the case. Therefore, the evidence is legally sufficient to support the trial court's endangerment finding as to Mother's conduct under section 161.001(1)(E).

Further, the record reflects that, among other things, Mother acted as Father's enabler when she was not provoking him, lacked insight into her own mental health issues and Father's endangering conduct, and engaged in her own endangering conduct when interacting with Father and others. Therefore, the evidence is also factually sufficient to support the trial court's endangerment findings as to Mother's conduct under section 161.001(1)(E). We overrule the

43

portion of Mother's third issue pertaining to endangerment by conduct under section 161.001(1)(E).[17] *See H.R.M.*, 209 S.W.3d at 108; *J.P.B.*, 180 S.W.3d at 573; *see also In re I.D.J.*, No. 02-11-00367-CV, 2012 WL 2135579, at *3–8 (Tex. App.—Fort Worth June 14, 2012, no pet.) (mem. op.) (holding evidence of endangerment under section 161.001(1)(E) legally and factually sufficient when, among other things, mother smoked marijuana while pregnant and exposed child to domestic violence prior to the child's removal).

With regard to Father's best interest challenge in his fifth issue, we conclude that the evidence is factually sufficient. The record reflects that Father could not handle his own physical and emotional needs, let alone that of a very young special-needs child, and that his lack of impulse control presented emotional and physical dangers to M.P. now and would continue to do so in the future if she were returned to him. Father was unable to complete the programs available to help him promote M.P.'s best interest and failed to demonstrate stability with regard to his own behavior, housing, income, and plans for the child. In contrast, the record reflects that M.P. was bonded with her foster family and that M.P.'s foster mother, a speech therapist who had helped the child overcome her significant speech delay and had followed M.P.'s required course of

---

[17]Based on our disposition here, we do not reach the remainder of Mother's third issue regarding sufficiency under section 161.001(1)(D) or (O) or her fourth issue regarding section 161.001(1)(O) and due process, and we do not reach Father's second or fourth issues with regard to section 161.001(1)(D) and (O). *See E.M.N.*, 221 S.W.3d at 821.

44

treatment for the club feet despite the child's tantrums, wanted to adopt the child. Therefore, we overrule Father's fifth issue.

## V. Abuses of Discretion

In her first issue, Mother argues that the trial court abused its discretion by admitting Petitioner's Exhibit 1, which she describes as "750 pages of records (which neither the trial court, nor either party had reviewed)." She complains that DFPS had failed to provide the records in discovery. She also contends that admitting Petitioner's Exhibits 2 and 3 was an abuse of discretion. And in her second issue, Mother contends that denying her counsel's motion for a continuance to review the records was also an abuse of discretion. The "750 pages of records" to which Mother refers were M.P.'s medical records produced by Cook Children's Medical Center, and the other exhibits consist of Mother's and Father's JPS records. Assuming without deciding that the trial court abused its discretion by admitting all three exhibits and by denying the requested continuance and that Mother sufficiently preserved these complaints for our review, these errors were harmless.

In reviewing a case tried before the court instead of a jury, we generally assume that the trial court disregarded any incompetent evidence. *In re B.G.*, No. 12-06-00295-CV, 2011 WL 3629167, at *2 (Tex. App.—Tyler Aug. 17, 2011, no pet.) (mem. op.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 450 (Tex. 1982)). The admission of such evidence will generally not require reversal of the judgment when there is competent evidence to authorize its rendition. *Gillespie*,

45

644 S.W.2d at 450 (stating, after reviewing entire record in custody challenge, that error, if any, in admitting hospital records regarding mother's treatment for alcoholism did not call for reversal of the trial court's judgment). In *Gillespie*, the supreme court held that even if the evidence in the hospital records were omitted, there remained sufficient evidence to support the trial court's determination that the father's appointment as managing conservator served the child's best interest because of the mother's own admissions and other witnesses' corroborating testimony with regard to her alcoholism and multiple hospitalizations. *Id.* at 450–51.

The same reasoning in *Gillespie* applies here—based on our review of the entire record, *see U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012), the evidence contained in the exhibits was merely cumulative of other evidence admitted at trial. Therefore, these errors, if any, could not have caused the rendition of an improper judgment, and because they were included in the record for our review, could not have prevented Mother from properly presenting the case to this court. *See* Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005); *see also Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g) (stating that the complaining party must usually show that the whole case turned on the evidence at issue). We overrule Mother's remaining two issues.

## VI. Conclusion

Having overruled all of Mother's and Father's dispositive issues, we affirm the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED:  August 7, 2014